CITY OF ST. LOUIS, Respondent, *v.* WIGGINS FERRY COMPANY, Appellant.

### February 12, 1884.

1. ESTOPPEL.— Parties and privies to a deed are estopped from denying its recitals.

2. CONVEYANCES — PARTIES TO. — A deed to real estate which recites that "the undersigned are owners and part owners of the within described land," and contains no words of limitation, conveys the title of those who sign it, though all the owners do not sign it.

3. —— DESCRIPTION. — A description in a deed which refers to an annexed plat from which a surveyor can locate the boundary lines with certainty is sufficient.

4. —— CONDITIONS PRECEDENT. — Where land is conveyed upon condition that the city shall open a wharf, and the city makes reasonable provision for its ultimate improvement as a wharf, a failure to complete the whole work is not a breach of a condition precedent to the city's right of entry.

5. EJECTMENT — TITLE — COMMON SOURCE — STIPULATION. — A stipulation in an ejectment suit that both parties claim title from a common source, renders it unnecessary for the plaintiff to show title in such source.

6. TITLE — CONSIDERATION EXECUTED. — A failure to perform undertakings which may constitute an executed consideration, does not affect a title which has already passed.

APPEAL from the St. Louis Circuit Court, HORNER, J. Affirmed.

C. S. HAYDEN and R. H. KERN, for the appellant : The description in the deed is so uncertain as to render the deed void. — Campbell v. Johnson, 44 Mo. 247 ; Holme v. Shaufman, 35 Mo. 273 ; Bell v. Dawson, 32 Mo. 79. A grant of an easement can be made only by a person who has the entire interest in the soil. — Washburn, on Easements, p. 29, sect. 3 ; Portmore v. Brenn, 3 Dow. & R. 145.

LEVERETT BELL, for the respondent.

LEWIS, P. J., delivered the opinion of the court.

This is an action of ejectment. By the effect of record entries made before and at the trial, the controversy is confined to a parcel of land described thus : A tract of land in the city of St. Louis, lying east of city block two hundred and thirty-six, extending from the eastern front line of said city block to the Mississippi River, bounded on the north by the south line of Bogy Street produced to said river, on the south by the north line of Mound Street produced to said river, on the east by said Mississippi River, and on the west by the eastern front line of said city block two hundred and thirty-six. The trial was before the court, sitting as a jury, and resulted in a judgment for he plaintiff.

There was a common source of title in L. A. Benoist, L. V. Bogy, and Daniel D. Page, under whom the plaintiff

claimed by virtue of a conveyance or contract dated January 28, 1853, and the defendant under leases from the same persons dated June 1, 1870.   The controversy turns chiefly upon the effect to be given to the first mentioned instrument, which reads as follows : —

" Know all men by these presents, that · we, the undersigned, respectively, being the owners and part owners of the real estate on the westwardly bank of the Mississippi River, in front of the city of St. Louis, from the north side of Cherry Street to the northern boundary of said city of St. Louis, of the first part, and the said city of St. Louis of the state of Missouri, of the second part.

" Witnesseth, that the said first parties respectively, each for themselves, for and in consideration of the sum of one dollar to each of them in hand paid, by the said party of the second part, the receipt whereof is hereby acknowledged, and also, for the further consideration of the advantages resulting to each of them, from the improvements growing out of the extension of the wharf of said city from the north side of said Cherry Street to the northern limits of said city, and also for the further consideration of the relinquishment by said city, to the parties of the first part respectively, of all claims whatever, either in law or equity, so far as the parties of the first part may respectively own lots or part of lots bounding thereon, of, in, and to all accretions west of the ' proposed western boundary line of wharf ' as shown on the annexed plat marked ' A,' which is referred to and made a part of this contract, and, also, for the further consideration of the covenants and stipulations hereinafter entered into by and on the part of the said city of St. Louis, they, the said parties, have, and by these presents do respectively, each for himself, forever release, convey, and confirm unto the said city of St. Louis, all their right, title, interest, and claim of every description whatever, of, in, and to any and all lands lying eastwardly of and adjoining the above designated line on said plat denominated the ' pro-

posed western boundary line of wharf,' for the purpose of making a public wharf for said city. Where the red line exists on said plat, the said first parties respectively, each for themselves, do hereby release and forever convey to said city all the land in front of that line, and where the red line is broken, then all the land eastwardly of the black line as above designated on said plat is hereafter to be the limit of said first parties' respective claims eastwardly, and also all the right, title, interest, and claim of every description whatever of the said first parties respectively of, in, and to all the land lying westwardly of the ' proposed western boundary line of wharf' and eastwardly of the eastern line of ' Exchange Square,' as originally laid out by William Chambers, William Christy, and Thomas Wright, as shown by them on their map of a part of north St. Louis, dated the first day of January, eighteen hundred and seventeen, as will more fully appear by said map recorded in the recorder's office of St. Louis County, which is referred to and made part hereof for greater certainty, which ground lies between Jefferson and Warren Streets, as shown on said first named plat marked 'A;' provided, however, that said city shall not use said last named piece of land hereby conveyed for any other than such public purposes as 'Exchange Square' was originally dedicated by the proprietors aforesaid and in connection with the interests of said wharf, nor shall said city build on it or otherwise obstruct the view of the owners of property west of said ' Exchange Square,' and provided, also, that the said city of St. Louis shall establish the wharf by ordinance in conformity with said plat ' A ' (including the widening westwardly between Biddle and Florida Streets), and shall also make provision for opening the whole of said proposed wharf at the earliest period consistent with the public interest and the means of said city, before this contract shall be binding on said first parties, or any of them ; and the said second party covenants with the said first parties respectively, that one-half

or the whole wharfage annually collected by said city, from and after the second Monday of April, eighteen hundred and fifty-three (or so soon as the flat and descending plane of the wharf between Cherry and Plum Streets shall be completed, provided, in any event, the period shall not be extended beyond the second Monday in April, eighteen hundred and fifty-four), shall be expended on the wharf north of Cherry Street simultaneously as follows, to wit: One-half of said half, being one-fourth of the whole, shall be expended on said wharf between said Cherry and East Mound Streets annually, and the remaining fourth of the entire wharfage annually collected shall in like manner be expended on and for the improvement of the wharf between said East Mound Street and the northern limits of said city, in such manner as the council of said city may by ordinance direct, until the entire wharf owned by the city shall be improved, the said expenditures, however, only to be made on those parts of the wharf relinquished by said first parties respectively, or to which the said city has or shall otherwise acquire right or title for that purpose; and, also, the said city is to refund to those parties respectively signing this instrument, who claim the wharf between Cherry and Biddle Streets, all expenditures made by each respectively for the improvement thereof, with interest on the same from the date of expenditure, the account of each expenditure to be verified by proper vouchers and affidavits to the satisfaction of the city engineer, who shall draw his warrant for the same upon the auditor of said city, chargeable to the wharf, and the amount so certified shall be paid out of and charged to the general wharf funds.

"In consideration of all which the said city of St. Louis doth hereby forever relinquish and convey to said first parties respectively, their heirs and assigns forever, all right, title, interest, and claim whatever, either in law or equity, of, in, and to all accretions west of said proposed western boundary line of wharf, as shown on the said plat

'A,' so far as the said parties of the first part may respectively own lots or part of lots bounding on said proposed western boundary line of wharf, it being understood that some of said first parties have made leases for portions of the wharf property hereby conveyed, the terms of which have not expired, and the conveyance to the city is made by the said parties subject to said leases now in existence. And it is further understood that all parties signing this instrument, conveying to the city of St. Louis the right of way or easement for all streets or extensions of streets as laid down on said plat 'A,' and established by ordinance numbered two thousand nine hundred and thirty-two.

" In testimony whereof, the parties of the first part have hereunto set their hands and affixed their seals, and the said second party have caused this instrument to be signed by the mayor of said city of St. Louis, and their corporate seal to be hereto affixed, this twenty-eighth day of January, 1853."

This instrument appears to have been duly executed and acknowledged by forty-six individuals, including the said Benoist, Bogy, and Page, and by the city of St. Louis. Its introduction in evidence was objected to by the defendant on various grounds.

1. It is contended that the deed was not joined in by all the parties of the first part, and therefore was never perfected as contemplated, on the face of the deed itself. There is nothing in this contention. There was some outside testimony to the effect that certain owners of lots, within the extreme limits described, refused to join in the deed. But nothing in the structure of the instrument intimates that it is not to be binding on those who sign it, unless also executed by other persons. Those who did execute it, and their privies, are estopped to deny its recitals. It recites that " the undersigned " are the owners and part owners of the real estate within described limits, which include all the land therein appropriated to wharf purposes, as well as to

the parcel here in controversy. So far as the general object of the deed might be affected, this recital excludes the existence of other ownerships. We know of no principle upon which the defendant can be heard to deny the solemn recital of its grantors, for the purpose of defeating the very end to which that recital was directed. The conveyance, for whatever it may be worth, is conclusive against those who signed it, and all who claim under them. It is of no consequence that specific lot boundaries are not mentioned in connection with the names of the separate owners, respectively. The deed attaches to whatever title was held by any of the parties to any lot or parcel within the boundaries described.

2. The record shows an agreement between counsel, in the course of the trial, that both parties claim the premises under Benoist, Bogy, and Page, as the common source of their conflicting titles, and that the plaintiff's right depended on the sufficiency of the contract or deed of January 28, 1853, which was prior in date to the lease held by the defendant. This made it unnecessary for the plaintiff to show what title was held by its grantors, or to identify the lot further than by showing that it was embraced within the description contained in the deed. It furnishes a complete answer to all that is said for the defendant about a supposed failure to show title in Benoist, Bogy, and Page to the specific lot in dispute. *Miller* v. *Hardin*, 64 Mo. 545; *Fellows* v. *Wise*, 49 Mo. 350.

3. The defendant insists that the deed is void for uncertainty in its description of the property. The descriptive words refer to a plat annexed to the deed, on which is laid down a line representing the western boundary of the proposed wharf. This line is also declared to be the western boundary line of the land intended to be conveyed. It may be conceded that, if the line were a mere figurative one on the map, with no reference by course or distance to any known monument or object on the ground, whereby a surveyor

might find and stake it out with certainty on the premises, it would fix no boundary of any tract on the earth's surface. But such is not the case here. Main Street, an established and monumental object, is shown on the map as parallel with the proposed wharf line, and a number of streets with their names given, are laid down at right angles with both. The distance from Main Street to the wharf line (which here coincides with the east line of block 236), along all the intersecting cross streets, are noted in characters, familiar to surveyors and map makers, so that there can be no difficulty or uncertainty about locating the wharf line at any point in its extent. One of the witnesses, a civil engineer and surveyor, had in fact identified and located the line, as described and marked on the map. There is no uncertainty of description in this particular. There was abundant testimony to show that the land in dispute lay east of the line referred to, which was its western boundary, and between the north side of Cherry Street and the northern boundary line of the city of St. Louis, and was, therefore, a part of the entire wharf tract described in the deed.

4. It is contended, that if anything is conveyed by the instrument in question, it is only upon conditions precedent, which are not shown to have been performed on the part of the city. We must here discriminate between conditions precedent and undertakings which may constitute an executed consideration. Without a performance of the first, no title passes. Failure to perform the second may subject the delinquent to an action, but will have no effect upon the title already passed. An inspection of the deed together with the testimony, in this case, will clearly show that no condition precedent to the conveyance remains unfulfilled, and if there has been any failure of performance by the city, it was only as to undertakings which were independent of the transfer of title.

It is provided "that said city of St. Louis shall estab-

lish the wharf by ordinance, in conformity with said plat 'A,' and shall also make provision for opening the whole of said proposed wharf, at the earliest period consistent with the public interest and the means of said city, before this contract shall be binding on said parties of the first part, or any of them." The evidence shows a literal compliance with these conditions. The titles of certain ordinances adopted by the municipal legislature correctly indicate their purpose and effect. One was "An ordinance locating and establishing the wharf north of Cherry Street, and to open and establish certain streets in the northern part of the city, and to improve the wharf from Plum Street to the southern limits of the city," approved December 13, 1852. This ordinance sets out at length the conditions embraced in the deed of January 28, 1853, and authorizes the mayor to secure a conveyance by agreement upon the terms thus expressed. Another was "An ordinance changing the wharf between Biddle and Florida Streets, and providing for the opening of unopened portions of the wharf," approved November 14, 1853. Another was "An ordinance confirming the award of the jury on the opening of the wharf between Cherry and Biddle Streets, and providing means for the same," approved February 23, 1854. Another was "An ordinance establishing the wharf between Biddle and Mullanphy Streets, and providing for opening the unopened portion of the wharf," approved July 28, 1855. Another was "An ordinance to establish and open the wharf from Biddle Street to the northern boundary of the city, and from Hazel Street to the southern boundary of the city," approved August 6, 1864. Another was "An ordinance to authorize the mayor and comptroller to issue bonds for the improvement of the wharf and harbor," approved January 30, 1866. Besides these, sundry ordinances were passed at different times before the commencement of this suit, for acquiring and paying for property within the described

limits, for wharf purposes, which was owned by persons who did not join in the conveyance in question. It does not appear that the city authorities omitted the passage of any ordinance which would have been necessary or appropriate for establishing the wharf in conformity with the plat, or for the making of provision " for the opening of said proposed wharf, at the earliest period consistent with the public interest and the means of said city." The defendant undertook to show that some portions of the wharf were yet unfinished. But actual completion constituted no part of the conditions precedent. A stipulation to that effect would have been an absurdity. It would have required the city to grade, build, and pave the wharf, before its acquisition of a right to enter upon the land. The contract demands nothing more than that the city shall, in good faith, take such steps as will effectually devote the land described to the purposes of a wharf, and as will make reasonable provision for its ultimate improvement and adaptation to those purposes. We can not perceive from the testimony that the city has failed of due performance in this regard. As the only instruction given was one to the effect that, on the evidence, the plaintiff was entitled to recover, and none was refused, except the defendant's demurrer to the evidence, the presumption in this case must be in favor of the trial court's application of correct rules of law to the controverted questions of fact ; and so, the ultimate finding on this point, having, at least, a substantial support in the testimony, should not be here disturbed.

The defendant insists, that as to the particular case before us, there is a failure of condition precedent, because the wharf has not been graded and paved upon or in front of the lot here in dispute. This claim should be sufficiently answered by what has already been said. There is no condition precedent as to absolute completion of the work at any point. There was testimony tending to show that a dyke was built in the river, along the shore line, as a nec-

essary support to the grading material to follow, and that this dyke extends along the whole length of the tract described in the deed, that is, from Ashley Street, which is below Cherry Street, to the then northern city limits. This, of course, includes the land in controversy. The work was done some years after the contract of 1853, and we can not see why, as defendant's counsel insist, there should be evidence more directly tending to connect it with the contract.

It was shown in testimony that the city, in 1866, undertook to condemn, for wharf purposes, part of the property supposed to have been conveyed by the deed of January, 1853. This proceeding ultimately failed, by a decision of the supreme court, on account of irregularities. *Anderson* v. *City*, 47 Mo. 479. The defendant here claims that the city, in electing to proceed by this method, surrendered whatever rights it may have acquired under the contract of 1853. We can understand how the defendant, or its grantors, if they were parties to that proceeding, might have set up the contract as a defence against it; but confess our inability to discover any other logical connection between the two events.

The conditions in the contract with respect to expenditures from the revenues to be derived from the wharf, are clearly independent undertakings on the part of the city, and, whether complied with or not, have nothing to do with the city's right of possession. It can hardly have been supposed that the city would make such expenditures before acquiring possession and putting the wharf in condition to command revenues.

Without going further into details, we may say, in general terms, that no error is shown to us, in the proceedings of the circuit court, and that the judgment rendered appears to be a legitimate conclusion from the evidence. There is nothing in the objection that the conveyance to the city did not carry a fee simple. The action is possessory,

and the city can have no benefit of its contract, if not through the medium of possession under it. The judgment is affirmed. All the judges concur.